UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ANTHONY THOMAS LEE BAKER,<br><br>Defendant. | 1:23-CR-10037-RAL<br><br><br>OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION AND DENYING MOTION TO SUPPRESS |

Defendant Anthony Thomas Lee Baker ("Baker") moves to suppress evidence seized during a January 2023 traffic stop. Magistrate Judge Mark A. Moreno conducted a hearing and recommended denial of Baker's motion. For reasons explained below, this Court adopts the Report and Recommendation and denies Baker's Motion to Suppress.

I.      Facts

The underlying traffic stop occurred around 9:00 p.m. on January 17, 2023. Suppression hearing transcript ("ST") at 7. Corporal Austin Nelson ("Nelson") of the Watertown Police Department was just over three hours into a twelve-hour shift. Id. at 7, 45. While patrolling Watertown's residential streets, he pulled onto 5th Avenue behind a black Chevrolet Silverado driven by Defendant Baker. Id. at 8. Unable to see any registration sticker on Baker's rear license plate, Nelson activated his emergency lights and initiated a traffic stop. Id. Baker did not

1

immediately pull over, Ex. 1 at Dash Cam,[1] but rather kept driving westbound for a block and a half before stopping. ST at 9.

Once Baker pulled over, Nelson exited his patrol car and approached the truck on foot. Ex. 1 at 00:01:05. As he neared the rear of the pickup, he noticed that the registration sticker was not missing but was almost entirely covered with snow. ST at 8, 24. Even at close range, Nelson could make out no more than the very edge of the sticker. Id. at 24. Nelson contacted Baker at the front driver's side window. Ex. 1 at 00:01:12. Nelson explained to Baker the reason for the stop: the registration sticker on Baker's rear license plate was covered with snow which obstructed law enforcement's ability to read it. Id. at 00:01:26. He then asked Baker for his license, registration, and proof of insurance. Id. at 00:01:31. Baker failed to provide all the requested documents. See id. at 00:01:31–00:02:12. He told Nelson that he was driving his boss's truck and did not know where to find the proof of insurance. Id. at 00:01:38. Upon reaching for his wallet, Baker let fly a string of expletives, remarking that he must have "grabbed the wrong wallet" after his boss gave him a credit card to fill the truck with gas. Id. at 00:01:50. From this wrong wallet, however, Baker produced his tribal identification card, which Nelson took in lieu of a driver's license, noting that it was at least some form of identification. Id. at 00:02:02. When asked if he had a driver's license, Baker said his Minnesota driver's license was in his other wallet. Id. at 00:02:05–00:02:12.

Nelson next asked Baker why he did not stop right away. Id. at 00:02:18. Baker pointed to an electrical module mounted on the dashboard while explaining that he "was trying, to like stop and this thing right here is something, I don't know but it." Id. at 00:02:20. Nelson responded

---

[1] Exhibit 1 contains both dash and body camera video footage. For simplicity, this Court will cite the body camera footage as "Ex. 1 at (timestamp)" and the dash camera video as "Ex. 1 at Dash Cam."

that the module Baker was referring to is an assist for pulling trailers. Baker replied, "Yeah. I can't escape. I was like, okay, so." Id. at 00:02:30.

About three minutes into the stop, Nelson asked Baker to join him in his police car so he could get the information needed to verify Baker's license and registration. Id. at 00:03:05. Baker hesitated in response, asking "is that necessary?" Id. at 00:03:10. When Nelson insisted that it was necessary, Baker replied, "Okay. Sh*t. Um, alright." Id. at 00:03:15. While exiting the truck, Baker reached his arm down toward the floor or the pocket at the bottom of the driver's door. Id. at 00:03:20–00:03:30. As they walked toward the police car, Nelson instructed Baker to keep his hands out of his pockets. Id. at 00:03:36. Once Baker arrived at the front passenger door of the police cruiser, he again hesitated. Id. at 00:03:40. He paused and turned his body, so he was facing away from the car. Id. Nelson directed Baker to open the door and get in. Id. at 00:03:46. Even then Baker did not get fully into the car. Id. at 00:03:50. Rather, he sat halfway on the seat with his right leg hanging out the open passenger door. Id. Nelson then instructed Baker to put both legs in the car and close the door. Id. at 00:04:05.

Once in the car, Nelson began obtaining Baker's personal information for the NCIC search. ST at 13; Ex. 1 at 00:04:10. Nelson first asked Baker if he still resided on 3rd Avenue. Ex. 1 at 00:04:41. Baker first responded, "Yep," but soon corrected himself, stating that he lived with his boss but did not know that address. Id. at 00:04:52. Then, after confirming his phone number and without any obvious impetus, Baker blurted, "Fu*k. Sh*t." Id. at 00:05:13–00:05:16. When Nelson asked about the expletives, Baker stated, "Nothing. I was supposed to get a call from him because he's, you know, he slipped and fell yesterday and he had, you know, ambulance[2] and stuff

---

[2] Both the transcript for the body camera footage and Nelson's testimony at the suppression hearing refer to Baker's reference to an ambulance as a "handgun." However, based on this Court's review of exhibit 1, Baker clearly says "ambulance."

3

come. Then he keeps calling on me just in case." Id. at 00:05:20–00:05:30. Nelson then asked who Baker's boss was. Id. at 00:06:05. Baker said it is "Ray, last name starts with an N." Id. at 00:06:07. Nelson further inquired, "you're living with him, and you don't even know his name?" Id. at 00:06:10. Baker replied that "a friend just, you know, put [him] up there." Id. at 00:06:13.

About seven minutes into the traffic stop, a second police officer arrived on scene. Id. at 00:03:36. Nelson stepped out of his car and asked the officer to search the area around the passenger side of his police car; Nelson explained that Baker paused for an appreciable amount of time before getting into the car, and he suspected that Baker ditched something under the car or in the snowbank alongside the car. Id. at 00:06:40–00:07:00. Within mere moments of searching the snowbank directly next to where Baker sat, the officer found an unlabeled bottle full of pills. Id. at 00:07:05. Upon receiving this information, Nelson informed Baker that he was being detained. Id. at 00:07:30–00:07:45. Baker denied any association with the pill bottle; he claimed not to have thrown them and stated, "Like, when you pulled in, I looked over and I just seen that." Id. at 00:07:50. Nelson handcuffed Baker, placed him in the back of the patrol car, and informed him that he would be detained until they figured out whether the pills were his. Id. at 00:08:00.

After placing Baker in the back seat of his patrol car, Nelson asked him if there were any other items he should know about. ST at 18. Baker admitted that there was marijuana in the center console and a firearm in the vehicle on the front seat underneath his coat. Id. Baker also told Nelson that he had a felony conviction. Id.

Meanwhile, Nelson had dispatch run Baker's license out of Minnesota. Id. at 19. The results showed that Baker's driver's license had been revoked; he also had a no bond arrest warrant out of Roberts County for being a felon in possession of a firearm and possession of a controlled substance. Id. Nelson testified that he would have arrested Baker based on the warrant alone. Id.

4

A subsequent search of the vehicle revealed a .45 caliber pistol on the front passenger seat hidden underneath a coat, just as Baker described. Id. at 20. Inside the driver's side door pocket, the officers found what they described as a "drug kit," a black bag containing a butane torch, a glass methamphetamine pipe, a snort tube, a plastic straw, and a clear plastic baggie with three pills. Id. A search of the center console revealed another methamphetamine pipe and a straw snort tube, all inside a sunglasses case. Id.

A grand jury indicted Baker for possession of a firearm by a prohibited person. Doc. 1. Baker moved to suppress evidence that law enforcement seized during the January 17, 2023 traffic stop. Doc. 18. After holding an evidentiary hearing, Magistrate Judge Moreno entered a Report and Recommendation for Disposition of the Motion to Suppress recommending denial of the motion in all respects. Docs. 34, 35. Baker objected to the report and recommendation. See Doc. 42. Baker makes two arguments for why this Court should suppress the evidence obtained from Nelson's January 17, 2023 traffic stop: (1) the traffic stop was not justified at its inception and (2) Nelson prolonged the stop beyond the time reasonably needed to dispel his suspicions that a traffic violation had occurred. See Docs. 19, 42. This Court addresses each argument below.

## II.    Legal Standards

When a party objects to a magistrate judge's report and recommendation, a district court judge must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). The district court "judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id.

"The Fourth Amendment protects against unreasonable searches and seizures." United States v. Betts, 88 F.4th 769, 773 (8th Cir. 2023) (cleaned up) (quoting U.S. Const. amend. IV).

5

A traffic stop is a type of "seizure" under the Fourth Amendment. United States v. Gordon, 741 F.3d 872, 876 (8th Cir. 2013). To be reasonable at its inception, a traffic stop must be "supported by either probable cause" or reasonable, articulable "suspicion that a traffic violation has occurred." United States v. Rederick, 65 F.4th 961, 965 (8th Cir. 2023) (cleaned up and citation omitted). "Probable cause exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred." Id. (cleaned up and citation omitted). Probable cause for a traffic stop exists "as long as an officer objectively has a reasonable basis for believing that the driver has breached a traffic law." Gordon, 741 F.3d at 876 (cleaned up) (quoting United States v. Coney, 456 F.3d 850, 856 (8th Cir. 2006)). "Reasonable suspicion exists when an officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." Id. (cleaned up and citation omitted).

The relevant question when reviewing a traffic stop is whether it was objectively reasonable for the officer to believe that a traffic violation had been committed, not whether a traffic violation actually occurred. See United States v. Hastings, 685 F.3d 724, 727–28 (8th Cir. 2012) (explaining that it was unnecessary to determine whether the defendant had actually committed a traffic violation because it was objectively reasonable for the officer to believe that the defendant has done so). The Fourth Amendment requires that police officers be reasonable, not perfect. Heien v. North Carolina, 574 U.S. 54, 60–61 (2014). Thus, a traffic stop may be based on an officer's mistake of fact or law, so long as the mistake is objectively reasonable. Id. at 60–67. An officer's subjective motivation for conducting a traffic stop is irrelevant. Rederick, 65 F.4th at 965 (citing Whren v. United States, 517 U.S. 806, 813 (1996)).

## III.    Discussion

### A. Existence of Probable Cause to Stop Baker's Vehicle

Nelson testified that he initiated the traffic stop because he could not identify a valid registration sticker on Baker's rear license plate.  Under South Dakota law, all drivers must have a front and rear license plate that "shall at all times, as far as is reasonably possible, be kept clear and free of mud, ice, or snow so as to be clearly visible." SDCL § 32-5-98.  The license plate must also display the proper vehicle registration sticker; failing to do so is a class 2 misdemeanor. SDCL § 32-5-2.4.  A reasonable officer could interpret South Dakota law as requiring drivers to keep their license plate and registration sticker free from obstruction and clearly visible when reasonably possible.  See State v. Vento, 604 N.W.2d 468, 471 (S.D. 1999) (quoting United States v. Dumas, 94 F.3d 286, 290 (7th Cir. 1996), for the axiom that a driver's "failure to display *prominently* a registration sticker, alone, would provide an officer with reasonable suspicion sufficient to justify at the very least an investigatory stop"); United States v. Farlee, 427 F. Supp. 3d 1123, 1126–27 (D.S.D. 2019); United States v. Quijano, No. CR. 05-40106, 2005 WL 2704902, at *5 (D.S.D. Oct. 20, 2005) (determining that a license plate holder obstructing the registration sticker provided reasonable suspicion to conduct traffic stop under South Dakota's statutes regulating license plates); see United States v. Gilson, 654 F. App'x 247, 248 (8th Cir. 2016) (unpublished) (per curiam) (holding that a registration sticker that was "almost three-quarters" obstructed provided law enforcement probable cause to conduct a traffic stop under an Iowa law).[3]

---

[3] Courts in other jurisdictions have reached similar conclusions. See generally United States v. Trujillo, No. 23-cr-00748, 2023 WL 8258597, *2–3 (D. New Mexico, Nov. 29, 2023) (recognizing that traffic stops for obstructed vehicle registration stickers are reasonable under the Fourth Amendment and finding that a traffic stop was lawful based on a vanity plate partially obstructing a registration sticker); United States v. James, 22-10093, 2023 WL 5206045, at *8 (D. Kan. Aug. 14, 2023) (recognizing that even "slight obstructions" of a registration sticker can justify a traffic stop); United States v. Richardson, 801 F. App'x 157, 158 (4th Cir. 2020) (per curiam)

Baker does not dispute that an obstructed registration sticker provides probable cause, or at least reasonable suspicion, to conduct a traffic stop if it was reasonably possible for the driver to keep the registration sticker free from foreign material to be clearly visible. Rather, Baker posits that the weather on January 17, 2023, did not make it "reasonably possible" to keep the plate free from snow, and therefore, Nelson was not justified in making the stop. Doc. 19 at 2–5. Nelson's testimony, which was credible and unrefuted, undermines Baker's argument. According to Nelson, it had snowed on January 17, 2023, but the snow stopped around noon, more than nine hours before the traffic stop occurred. ST at 7. Nelson explained that it would be both unreasonable and against Watertown Police Department policy to conduct traffic stops for snow covered license plates while it was actively snowing. ST at 25. Nelson, however, believed that by nine hours after a snow fall, drivers had sufficient time to clear snow off their car before taking to the roadways. ST at 26. Nelson's interpretation of "as far as reasonably possible" language within SDCL § 32-5-98 is sufficiently reasonable to support a justifiable belief that Baker violated a traffic law. See Rederick, 65 F.4 at 965; Gordon, 741 F.3d at 876.

What is "reasonably possible" under a statute like SDCL § 32-5-98, like probable cause itself, involves an objective inquiry dependent on the totality of circumstances present in each case.

---

(unpublished) (noting how, even absent state law, "a vehicle's apparent failure to display some form of visible license plate/registration tag, temporary or permanent, gives rise to a reasonable suspicion that its driver might be violating any one of a multitude of applicable traffic and equipment regulations" (citation omitted)); United States v. Muhammad, No. 19-cr-0168, 2019 WL 7593270, *5 (D. Minn. Dec. 20, 2019), adopted in, 2020 WL 247324 (snow covering the registration sticker on a rear license plate provided an independent basis of probable cause to conduct a traffic stop); United States v. Orduna-Martinez, 561 F.3d 1134, 1138 (10th Cir. 2009) (recognizing that state law prohibits obstruction of registration decals and serves as a basis for a traffic stop); United States v. Henry, 853 F.3d 754, 757–58 (5th Cir. 2017) (holding that officer's belief that obstructed registration sticker violated a Louisiana statute that read "every permanent registration license plate shall be maintained free from foreign materials and in a condition to be clearly legible" was objectively reasonable and supported by reasonable suspicion (cleaned up)).

8

The circumstances here suggest that it was reasonably possible for Baker to have cleared the snow off his license plate to ensure it was entirely visible. Baker told Nelson that he was living in Watertown and was driving home after helping a friend install a porch light when he got pulled over. Ex. 1 at 00:03:00; 00:04:38. Unless that friend lived more than nine hours away and the gas tank could sustain such lengthy travel without stopping to refill, Baker would have exited and entered his car *at least once* within the nine hours since it last snowed. Baker could have walked around his truck to see if snow or ice obscured parts of his license plates before driving home.

Baker counters that the snow-covered roads did not make it reasonably possible to keep the license plate clear because the truck's tires could fling snow onto the truck's bumper to obstruct the license plate. Doc. 42 at 4. The evidence does not support Baker's hypothesis. First, Nelson's dash cam footage does not show the tires of Baker's truck dislodging any appreciable amount of snow, let alone enough to accumulate in the middle of the truck's bumper and obstruct the license plate. See Ex. 1 at Dash Cam. Second, the video shows the road clearly alternating between hard packed snow and tire tracks rutted down to pavement, not conditions where snow is being blown about or near bumper level. Id.

Lastly, Baker argues that the stop was unjustified because Nelson should have taken some alternative action before conducting the traffic stop, like calling in his license plate number to verify the registration or observing the registration on the front license plate. Doc. 42 at 5. These arguments gloss over the underlying justification for the stop—the obstructed registration sticker on the rear license plate in violation of SDCL § 32-5-98. Even if Baker's truck were validly registered, the obstructed sticker constituted a minor traffic violation. And any traffic violation— no matter how minor—provides reason to conduct a traffic stop. United States v. Rutledge, 61 F.4th 597, 601 (8th Cir. 2023). Thus, the traffic stop was justified at its inception.

### B. Whether the Traffic Stop was Unreasonably Prolonged

Baker next argues that the stop was unconstitutional because Nelson's actions prolonged the stop beyond the time reasonably necessary to complete its mission. "A traffic stop supported by probable cause or reasonable suspicion may nonetheless violate the Fourth Amendment if it lasts longer than necessary to effectuate" the mission of the stop. United States v. Navarette, 996 F.3d 870, 874 (8th Cir. 2021); Rodriguez v. United States, 575 U.S. 348, 354 (2015) ("[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission.'"). For support, Baker draws on three cases from the Supreme Court of South Dakota for the principle that an officer unreasonably prolongs a traffic stop if they observe facts that would dispel their suspicion that a traffic violation had occurred and take any action beyond explaining why they initially made the stop. See State v. Hayen, 751 N.W.2d 306, 307–08 (S.D. 2008); State v. Bonacker, 825 N.W.2d 916 (S.D. 2013); and State v. Amick, 831 N.W.2d 59 (S.D. 2013). Relying on these cases, Baker argues that Nelson should have either (1) run the license plate number to verify the vehicle's registration before initiating the stop, (2) brushed the snow away from the sticker to verify its validity, or (3) verified the registration by looking at the front license plate. Doc. 42 at 6–8. By completing any one of these three alternatives, Baker argues that Nelson could have unobtrusively discharged the justification for the stop and thus terminated the stop's mission.

Baker's argument, however, is misplaced for several reasons. First, the stop was not limited to verifying Baker's registration. As earlier explained, Nelson had a reasonable belief that an obstructed registration tag was itself a traffic violation. For that reason, the facts here are materially distinguishable from the cases in which Baker seeks refuge. In each of those three cases, the officer conducted a traffic stop on the suspicion that a traffic violation had been

committed. When the officers discovered that no violation had in fact occurred, the justification

for the stop had dissipated, and there was no further suspicion of ongoing unlawful activity. Cf.

Amick, 831 N.W.2d 59 (S.D. 2013) (declining to suppress evidence because officer observed open

beer bottle in the pickup as he approached the driver). Here, however, Nelson had a reasonable

belief that the obstructed license plate tag itself justified a traffic citation. Therefore, even if

Nelson managed to confirm that Baker's registration was valid, the stop's mission was not

concluded until Nelson had issued either a warning or ticket, or the time to reasonably do so had

passed. See Rodriguez, 575 U.S. at 354.

Baker's position also ignores additional reasons for Nelson to prolong the stop. Baker not

only failed to promptly stop, but he also failed to produce a vehicle registration or driver's license

when asked. SDCL § 32-5-91 concerning vehicle registration provides, "The registration referred

to in § 32-5-90 is subject to inspection by any peace officer at any time. The registration shall, at

all times, while the motor vehicle . . . is being operated within this state, be in possession of the

operator."[4] In State v. Ramirez, 535 N.W.2d 847, 849 (S.D. 1995), the South Dakota Supreme

Court determined that "[l]aw enforcement officers are entitled to diligently investigate to verify a

vehicle's registration." And the "[f]ailure to possess a valid registration is a petty offense,"

entitling officers to detain a driver for the time necessary "to diligently investigate [and] verify a

vehicle's registration." Ramirez, 535 N.W.2d at 849; see also SDCL § 23-1A-7. Because Nelson

was justified in conducting the traffic stop, he was allowed to verify that Baker, as operator of the

---

[4] SDCL § 32-5-90 states, "The department shall furnish . . . with each pair of number plates or
number stickers for passenger vehicles, . . . *a registration*, which shall contain the following data:
the name of the registered owner of the . . . motor vehicle . . . the owner's post office address, the
make of the vehicle, the year of model, the model or letter designated by the manufacturer,
manufacturer's serial number, if any, the registration or license number, and date of issue of the
registration. The registration shall contain the registration number denoted on the number plate or
plates on which the registration is issued." (Emphasis added).

vehicle, possessed valid registration,[5] proof of insurance or financial responsibility, and a valid driver's license.  See Rodriguez, 575 U.S. at 349 ("These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.").  Baker's failure to produce his license and registration provided additional reasons to prolong the stop.

Finally, Baker's cases are not binding on this Court.  A federal court is not restrained by a state court's interpretation of federal law.  See, e.g., United States v. Bedford, 519 F.2d 650, 654 n.3 (3rd Cir. 1975).[6]  And all three cases predate the Supreme Court of the United States' decision in Rodriguez, 575 U.S. at 354, which described the mission of a traffic stop as "addressing the traffic violation that warranted the stop and attending to related safety concerns."  Id. (cleaned up and internal citation omitted).  "Beyond determining whether to issue a traffic ticket, an officer's mission [involves] 'ordinary inquiries incident to [the traffic stop],'" *including* "checking the driver's license, determining whether there are warrants outstanding against the driver, and inspecting the automobile's registration and proof of insurance."  Id. at 355 (second alteration in original); Navarette, 996 F.3d at 874 (citation omitted).  "When complications arise carrying out these tasks, 'police may reasonably detain a driver for a longer duration than when a stop is strictly routine.'"  Navarette, 996 F.3d at 874 (quoting United States v. Olivera-Mendez, 484 F.3d 505,

---

[5] This Court also notes that sometimes the operator's proof of registration under SDCL §§ 32-5-90 and 32-5-91 becomes necessary because records may suggest that a vehicle with proper registration stickers does not have valid registration.  See State v. Muller, 698 N.W.2d 285 (S.D. 2005).

[6] "It is a recognized principle that a federal court is not bound by a state court's interpretation of federal laws or of a state statute under misapprehension of federal law. Furthermore, a state court may not impose greater restrictions, as a matter of federal constitutional law, on police activity with respect to search and seizures than the United States Supreme Court holds to be necessary, although it may interpret a feature of state constitutional law more restrictively than the Supreme Court has interpreted an equivalent provision of the Federal Constitution. Oregon v. Hass, 420 U.S. 714 (1975)." Bedford, 519 F.2d at 654.

510 (8th Cir. 2007)). Otherwise, "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez, 575 U.S. at 354. Nelson's actions fall plainly within the scope of inquiry that Rodriguez permits. Nelson did not prolong the traffic stop by checking to ensure that Baker had a valid driver's license (which he did not), by asking for proof of insurance (which he could not provide), or by requesting the registration card as authorized in SDCL § 32-5-91 (which Baker also did not provide).

### C. Attenuation Doctrine Application

Even if Baker were right about some unconstitutional police action here, the attenuation doctrine, as explained in Magistrate Judge Moreno's Report and Recommendation, allows for admission of the evidence from the traffic stop. Doc. 35 at 11–12. The attenuation doctrine applies as an exception to the exclusionary rule "when the connection between unconstitutional police conduct and the evidence [obtained] is remote or has been interrupted by some intervening circumstance." United States v. Lowry, 935 F.3d 638, 642 (8th Cir. 2019) (internal quotation marks omitted). To determine whether the attenuation doctrine applies to any particular case, courts must apply a three-part test: (1) "the temporal proximity between the unconstitutional conduct and the discovery of evidence," (2) "the presence of intervening circumstances," and (3) "the purpose and flagrancy of the official misconduct." Id.

The tight temporal proximity between Nelson's stop of Baker, the expansion of the stop and the discovery of the .45 caliber pistol, drugs, and drug paraphernalia favors suppression if there were anything unconstitutional about the stop. Even so, the other two factors do not. The discovery of a valid warrant that predates and is "entirely unconnected with the stop" is a "sufficient intervening circumstance to allow the admission of evidence." Utah v. Strieff, 579 U.S. 232, 240–41 (2016). Here, like in Strieff, Nelson discovered a warrant for Baker's arrest. This

warrant was a "judicial mandate to . . . make an arrest, and the officer has a sworn duty to carry out its provisions." Id. (citation omitted).  There also was no purposeful or flagrant misconduct to deter here.  Id. at 241.  At worst, Nelson made a reasonable, good-faith mistake as to whether it was "reasonably possible" for Baker to keep his license plate free from snow.  That is not the type of conduct the exclusionary rule was meant to deter.  See id. (citing Davis v. United States, 564 U.S. 229, 236–37 (2011)).  After applying these factors, this Court finds that the attenuation doctrine reinforces that the evidence discovered is admissible because any arguably unconstitutional conduct stemmed from a reasonable, good-faith mistake, and the preexisting arrest warrant was a "sufficient intervening circumstance." Id. at 240, 242.

## IV.    Conclusion

For the aforementioned reasons, it is hereby

ORDERED that Defendant Anthony Thomas Lee Baker's objections to the Report and Recommendation, Doc. 42, are overruled, and the January 11, 2024 Report and Recommendation, Doc. 34, as explained on the record, Doc. 35, is adopted.  It is further

ORDERED that Defendant Anthony Thomas Lee Baker's Motion to Suppress, Doc. 18, is denied.

DATED this 23rd day of February, 2024.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

14